## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JOHN G. WATSON, | * | |
| Plaintiff, | * | |
| v. | * | CIVIL NO. RDB 03-2342 |
| CSA, LTD., et al., | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM OPINION

This is an employment discrimination suit filed by Plaintiff John G. Watson against Defendants CSA, Limited ("CSA"); Combat Support Associates; AECOM Government Services, Inc. ("AECOM"); Research and Analysis Maintenance, Inc. ("RAM"); and SMI International Corp. ("SMI"). Plaintiff Watson is an African American male and United States citizen who was employed by Defendants at the United States military base at Camp Doha, Kuwait. Plaintiff alleges that he was denied various promotional opportunities based upon his race, in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"). Combat Support Associates is an unincorporated joint venture composed of Defendants AECOM, RAM and SMI. Combat Support Associates has its principal place of business in Orange, California. Defendant AECOM is a United States company with its principal place of business in Ft. Worth Texas, Defendant RAM is a United States company with its principal place of business in El Paso, Texas, and Defendant SMI is a United States company with its principal place of business in

1

Alaska. CSA is a Cayman Islands company, which is wholly owned by Combat Support Associates, and which subcontracts with Combat Support Associates to perform various support services for the United States military at Camp Doha.

Now pending before the Court is Defendants' Motion to Dismiss, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, for lack of subject matter jurisdiction.  In support of that Motion, Defendants contend that this Court lacks jurisdiction over Plaintiff's job discrimination claims because Plaintiff is employed by CSA, a foreign corporation to which Title VII does not apply.  Plaintiff counters that Title VII does govern his claims because CSA is controlled by a joint venture of United States companies and is therefore subject to liability under Title VII.  In anticipation of Defendants' jurisdictional challenge, the Court allowed limited discovery on the question of jurisdiction.  All discovery relating to the jurisdictional issue has now been concluded.  The issues have been fully briefed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2004).  For the reasons that follow, Defendants' Motion to Dismiss will be denied.

## I.    Background

For the purposes of this Motion, this Court views the following facts in a light most favorable to the Plaintiff.  In February of 1998, ITT Federal Services International Corp. ("ITT") hired John Watson to work as a chemical/quartermaster mechanic at Camp Doha, Kuwait.  Prior to 1999, ITT was the primary civilian contractor responsible for providing logistical support to the United States Army at Camp Doha.

At some point prior to July of 1999, Defendants AECOM, RAM, and SMI formed a joint venture known as Combat Support Associates for the purpose of bidding on contracts with the United

States government.  At or near the expiration of the ITT contract, Combat Support Associates placed

a bid on the Camp Doha Combat Service Support Contract ("Camp Doha Contract").  In July of

1999, Combat Support Associates was awarded the Camp Doha Contract.  Combat Support

Associates was scheduled to assume the contractual responsibilities from ITT in October of 1999.

However, that transition was delayed until December of 1999.

 In September of 1999, while Combat Support Associates was preparing to assume the

contractual duties at Camp Doha, the company formed CSA.  (*See* Def.'s Mem. Supp. Mot. Dismiss

Ex. A.1.)  Although CSA is wholly owned by Combat Support Associates, an American company,

CSA is incorporated in the Cayman Islands, British West Indies.  Just over two months after CSA was

chartered, Combat Support Associates subcontracted all of the non-classified responsibilities for the

Camp Doha contract to CSA.   (*See* Def.'s Mem. Supp. Mot. Dismiss Ex. A.3.)  Under the

arrangement, Combat Support Associates' employees were to perform all of the classified work.  In

addition, Combat Support Associates maintained oversight of all work performed in connection with

the Camp Doha Contract.  (Def.'s Mem. Supp. Mot. Dismiss at 8.)

 When he received notice that the Camp Doha Contract was to change from ITT to Combat

Support Associates, Watson sent a cover letter and employment application to Combat Support

Associates seeking consideration for a position.  (Pl.'s Opp. Ex. 6.)  Watson received an

acknowledgment indicating that Combat Support Associates was considering his application.  (Pl.'s

Opp. Ex. 7.)  Thereafter, Watson received an employment offer dated September 17, 1999, on CSA

letterhead.  The offer was signed by Jon Harrell, who is identified as the "Authorized CSA, Ltd.

Representative."  (*Id.*)  Harrell was previously listed as a Combat Support Associates manager in the

3

bid for the Camp Doha contract.  (*See* Pl.'s Opp. Ex. 1 at 8.)

Shortly after he was officially hired, CSA sent Watson an "orientation packet" with various forms and other materials relevant to his employment.  Among those materials was a document describing the relationship between CSA and Combat Support Associates.  (Pl.'s Opp. Ex. 14.) According to the document, the United States government requires that all classified work performed under the Camp Doha contract must be performed by United States expatriate employees.  (*Id.*)  As a result, the document states that employees performing both classified and non-classified work are considered "dual employees" of CSA and Combat Support Associates.  (*Id.*)  Dual employees are directed to bill all classified work to Combat Support Associates and all non-classified work to CSA. (*Id.*)  Watson also received an "Agreement for Participation in Outside Training," as part of the new hire materials.  (Pl.'s Opp. Ex. 15.)  That agreement appears on Combat Support Associates' letterhead.  (*Id.*)   The document sets forth the outside training policy to be applied *both* to Combat Support Associates and CSA employees.  (*Id.*)

The "interrelationship" between CSA and Combat Support Associates is also apparent from other materials produced by the two companies. For instance, the Combat Support Associates' website suggests that CSA is a division of Combat Support Associates.  (Pl.'s Opp. Ex. 16.)[1] Although the phrase "CSA, Ltd." appears beneath the Combat Support Associates' logo, the website contains no explanation as to what CSA is nor of its relationship to Combat Support Associates.  (*Id.*) This despite the fact that the history, mission and structure of Combat Support Associates is explained

---

[1]Defendants have filed a separate Motion to Strike portions of the Declaration of John Watson (Paper No. 27).   By separate Memorandum and Order, that Motion is denied.

in great detail.  (*Id.*)  Another example of the close interplay between the companies is the similarities

between the key documents and forms used by the two entities.  Many of those documents are identical

in every respect save for the name of the entity appearing at the top of the document.  (*See, e.g.,* Pl.'s

Opp. Ex.s 13 & 18 (identical holiday election forms); 20 & 21 (disciplinary procedures); 22 & 23

(principles of business conduct)).

In the fall of 2001, Plaintiff Watson applied for a promotion to the position of branch manager.

(Bedea Decl. ¶ 2.)  Watson was not selected for the position.  (*Id.*)  Defendants contend that he was

not selected because he did not meet the posted experience requirements and because he

demonstrated poor management skills when serving as acting branch manager.  (*Id.*)  Later in the fall of

2001, Plaintiff applied for another promotion to the position of Technical Inspector.  Once again,

Plaintiff was not selected for the promotion.  (Aceto Decl. ¶ 2.)  Defendants submit that, although he

was otherwise qualified, he lacked sufficient experience in power generation to be qualified for the

promotion.  (*Id.*)

Alleging that he was denied the promotions based on his race, in violation of  Title VII of the

Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e, *et seq.*

("Title VII"), Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity

Commission ("EEOC").[2]    Plaintiff brought suit in this Court on August 11, 2003.  Pursuant to this

Court's February 26, 2004 Scheduling Order, the parties engaged in limited discovery on the issues

---

[2]Plaintiff did not attach a copy of the charge of discrimination with his Complaint, and the
record is silent as to that date of the charge, and as to the outcome of any administrative proceedings.
However, Defendants have not challenged Plaintiff's allegation that he made a timely charge, and thus
the Court will accept Plaintiff's allegations as true, at this stage of the proceedings.

pertaining to subject matter jurisdiction.  Having concluded that discovery, both parties submitted

lengthy briefs with numerous exhibits pertaining to the jurisdiction issue, which this Court has fully

considered.


II.    **Standard of Review**

Generally, when considering a Rule 12(b)(1) motion to dismiss based upon lack of subject

matter jurisdiction, courts should accept the plaintiff's well-pleaded allegations as true and construe the

complaint in favor of the plaintiff.  *Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir. 1982).  However,

where, as here, the challenge is to the factual basis of subject matter jurisdiction, courts "regard the

pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings

without converting the proceeding to one for summary judgment."  *Richmond, Fredericksburg &*

*Potomac R. Co. v. U.S.*, 945 F.2d 765, 768 (4th Cir. 1991).  The plaintiff bears the burden of

proving subject matter jurisdiction.  *Id.*  (citing *Adams,* 697 F.2d at 1219; *Trentacosta v. Frontier*

*Pacific Aircraft Indus.,* 813 F.2d 1553, 1559 (9th Cir.1987)).  When considering a factual challenge

to the court's subject matter jurisdiction, "[t]he district court should apply the standard applicable to a

motion for summary judgment, under which the nonmoving party must set forth specific facts beyond

the pleadings to show that a genuine issue of material fact exists . . . ."  *Id.*  "The moving party should

prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail

as a matter of law."  *Id.*

Furthermore, "[u]nlike the procedure in a Rule 12(b)(6) motion where there is a presumption

6

reserving the truth finding role to the ultimate factfinder, the court in a Rule 12(b)(1) hearing weighs the evidence to determine its jurisdiction." *Adams,* 697 F.2d at 1219.

Only when the jurisdictional facts are intertwined with the merits of the dispute should the court decline to decide the jurisdictional issue.  *Oram v. Dalton,* 927 F.Supp. 180, 184 (E.D.Va.1996) (citing *Adams,* 697 F.2d at 1219).   In this case, Defendants have moved to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.  While there is some authority for the proposition that the nature of Defendants' challenge is based upon the merits, the United States Court of Appeals for the Fourth Circuit has held that the determination as to whether a defendant is an "employer" under Title VII is properly considered under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  *See Woodard v. Virginia Bd. of Bar Examiners*, 598 F.2d 1345 (4th Cir. 1979).  Thus, the Court must weigh the evidence and make a determination as to the Court's subject matter jurisdiction over this matter.  *See Oram,* 927 F.Supp. at 184.

III.   <u>Analysis</u>

Defendants' instant Motion is based on the contention that this Court lacks subject matter jurisdiction because Defendant CSA, Plaintiff's direct employer, does not fall within the statutory definition of "employer"[3] under Title VII.  Indeed, Title VII of the Civil Rights Act of 1964, as amended

---

[3]Under Title VII, "[t]he term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person . . . ."  42 U.S.C. § 2000e(b).

by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), does not generally apply to

a foreign corporation operating abroad, such as CSA. *See* 42 U.S.C. § 2000e-1(c)(2). However, in

1991, Congress amended Title VII to provide that a foreign corporation operating abroad may be held

liable under Title VII, where the foreign company is "controlled by" an American enterprise. Civil

Rights Act of 1991, Pub.L. No. 102-166, § 109(c) (1991) (codified as amended at 42 U.S.C. §

2000e-1(c)). The amended statute provides that, if an American "employer" is deemed to "control" the

foreign company, any Title VII violation by the foreign company is presumed to constitute a violation by

the American employer. 42 U.S.C. § 2000e-1(c)(1).

The 1991 amendments were passed less than one year after the Supreme Court's decision in

*EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 248 (1991). In *Arabian Am. Oil*, the Supreme

Court held that Title VII did not apply outside of the territorial borders of the United States. *Id.* In so

holding, the Court recognized that, in order to overcome the well-settled presumption that

Congressional laws apply only within the United States borders, Congress must clearly express its

intent to extend a law outside of those borders. *Id.* Directly following that prescription, Congress

enacted, *inter alia,* Section 2000e-1(c), which clearly expresses the body's intent to extend Title

VII's reach to protect United States citizens employed abroad by foreign companies controlled by

American firms. *Cf. United States v. Wilkinson,* 169 F.3d 1236, 1238 (10th Cir.1999) (recognizing

that *Arabian Am. Oil* was superceded by statute); *Arno v. Club Med Inc.,* 22 F.3d 1464, 1472 (9th

Cir. 1994); *accord Shekoyan v. Sibley Intern. Corp.*, 217 F. Supp. 2d 59, 64 -65 (D.D.C. 2002)

*Flatow v. Islamic Republic of Iran,* 999 F. Supp. 1, 15 (D.D.C. 1998) (recognizing that *Arabian

Am. Oil* was superceded by statute); *Iwata v. Stryker Corp.,* 59 F. Supp. 2d 600, 603-04 (N.D.Tex

1999).

Section 2000e-1(c) sets forth the following factors to be applied in determining whether a

foreign corporation is controlled by an American employer: "(A) the interrelation of operations; (B) the

common management; (C) the centralized control of labor relations; and (D) the common ownership or

financial control, of the employer and the corporation." 42 U.S.C. § 2000e-1(c)(3). Although there is

a dearth of case-law applying these factors in the foreign employer context, there is a substantial body

of law applying the same four factors to determine whether related entities may be combined as

"integrated employer" under various employment statutes.[4] *See, e.g., Johnson v. Flowers Industries,*

*Inc.,* 814 F.2d 978, 981 (4th Cir. 1987) (recognizing the factors in the context of an age discrimination

claim, but noting: "We need not adopt such a mechanical test in every instance; the factors all point to

the ultimate inquiry of parent domination. The four factors simply express relevant evidentiary inquiries

whose importance will vary with the individual case."); *Hukill v. Auto Care, Inc.* 192 F.3d 437, 443

(4th 1999) (applying the four-part test to determine whether employees of parent and related entities

could be considered for minimum number of employee threshold of Family and Medical Leave Act, but

noting criticism of the factors by other courts); *Glunt v. GES Exposition Services, Inc.,* 123 F. Supp.

2d 847 (D. Md. 2000) (Williams, J.) (applying the factors in Title VII case involving parent/subsidiary

liability); *Thomas v. BET Sound-Stage Restaurant/Brettco, Inc.,* 61 F. Supp. 2d 448 (D. Md. 1999)

(Williams, J.) (same).

---

[4]The National Labor Relations Board originally developed this test as a means for determining
whether two entities constituted a single employer in the context of labor disputes, and that test was
subsequently approved by the Supreme Court in *Radio & Television Broadcast Technicians Local
Union 1264 v. Broadcast Service of Mobile, Inc.,* 380 U.S. 255(1965) (per curiam).

In applying the four-part test in these other contexts, courts "have focused on the second factor: centralized control of labor relations." *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2nd Cir. 1995) (quoting *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir.1983) (noting that "this criterion has been further refined to the point that the critical question to be answered then is: What entity made the final decisions regarding employment matters related to the person claiming discrimination?")); *see also Hukill*, 192 F.3d at 444 (citing *Trevino* with approval). Nonetheless, courts have also recognized that the four-part test "may also be satisfied by a showing that there is an amount of 'participation [that] is sufficient and necessary to the total employment process,' even absent 'total control or ultimate authority over hiring decisions.'" *Armbruster v. Quinn*, 711 F.2d 1332, 1338 (6th Cir. 1983) (quoting *Rivas v. State Board for Community Colleges and Occupational Education,* 517 F. Supp. 467, 470 (D.Colo. 1981)). In accordance with these prior applications, this Court will apply the statutorily-mandated four-part test with emphasis on the degree to which labor relations were centralized between the two entities.[5] *See id.*

---

[5] Defendants seek to dismiss Defendants AECOM, RAM and SMI contending that these entities have never been Plaintiff's employer, and that the entities are therefore not "employers" under Title VII. However, these entities are all partners in the Combat Support Associates joint venture. As such, the three partners in the joint venture are liable as "employers" to the extent that liability is imposed upon Combat Support Associates. *See Rowe v. Brooks,* 329 F.2d 35, 40 (4th Cir. 1964) (noting that joint venture operates like partnership, wherein partners have joint and several liability for losses incurred in furtherance of common enterprise); *EEOC v. Dowd & Dowd, Ltd.,* 736 F.2d 1177, 1178-79 (7th Cir.1984) (recognizing that partners in a law firm are employers within the definition set forth in Title VII) *abrogated on other grounds by Clackamas Gastroenterology Associates, P. C. v. Wells*, 538 U.S. 440 (2003); *Burke v. Friedman,* 556 F.2d 867, 869 (7th Cir.1977) (recognizing partners in accounting firm are employers under Title VII); *Ruich v. Ruff, Weidenaar & Reidy, Ltd.,* 837 F. Supp. 881, 884 (1993) (managing partner of law firm was employer under Title VII). Accordingly, in light of the Court's ruling as to Defendant Combat Support Associates, Defendants AECOM, RAM and SMI are proper Defendants.

A.      **Interrelation of Operations**

Despite the obvious close connections between CSA and Combat Support Associates, Defendants contend that the entities are not "interrelated" because the two companies observed corporate formalities, maintained separate accounting books and bank accounts, and carefully divided the classified and non-classified contractual duties.  (*See* Barlow Decl.; Sterling Aff.)  Further, Defendants assert that the sharing of infrastructure, staff and other resources is of no moment in light of the fact that "some degree of integration of operations is 'not uncommon in today's business climate.'" (Def.'s Mem. Supp. Mot. Dismiss at 9 (quoting *Hukill,* 192 F.3d at 443)).  However, these assertions are belied both by the relevant legal precedents and the undisputed record before this Court.

By all indications, the separation between CSA and Combat Support Associates is a legal mechanism designed to address United States taxation issues, while complying with the regulations promulgated by the United States Army.  This is evidenced most fundamentally by the fact that many Combat Support Associates' employees are also "dual employees" of CSA.  (Pl.'s Opp. Ex. 14.) These employees "charge" their time to the respective companies based on whether the day's tasks were classified or non-classified.   (*Id.*)  Significantly, one of the two supervisors who, according to Defendants, was responsible for denying Plaintiff a promotion, was a "dual status" employee of CSA and Combat Support Associates when he made the decision to deny Plaintiff's employment.  (Bedea Decl. ¶ 4).  This legal mechanism essentially results in a largely fictional division in which the two "distinct" companies operate in a nearly identical fashion; utilizing the same policies, procedures, business forms and disciplinary proceedings.  (*See* Pl.'s Opp. Ex.s 13 & 18 (identical holiday election

forms); 20 & 21 (disciplinary procedures); 22 & 23 (principles of business conduct)).  Moreover,

though Defendants submit that the respective directors of CSA and Combat Support Associates are

housed within separate offices in Camp Doha, the human resources offices are shared between the two

entities.  (Def.'s Reply at 10.)  In addition, the companies presumably share offices, equipment and

other resources to the extent that the "dual employees" occupy the same space when performing work

for either company.

Nonetheless, Defendants insist that the "interrelatedness" factor is not satisfied in light of *Hukill,*

192 F.3d 437.   In *Hukill,* the Fourth Circuit reviewed a district court's determination that the

employees of several related automotive service stations could be combined to satisfy the fifty

employee requirement under the Family and Medical Leave Act, 29 U.S.C. §§ 2601-2654.  *Id.*  In

reversing the district court's finding, the Fourth Circuit noted that, although the defendant entities were

commonly owned, the record revealed that each service station operated independently.  *Hukill v.*

*Auto Care, Inc.,* 192 F.3d 437, 443 (4th Cir.1999)("Each company operates at separate locations,

files separate tax returns, holds separate shareholder and Board of Directors' meetings, conducts

separate banking operations, is not undercapitalized, in general, purchases goods separately, enters into

separate lease agreements, is not managed day-to-day by the same person, and does not share office

space.")  The court so held despite the fact that each of the service stations purchased administrative

services, such as accounting and payroll services, from another commonly-owned entity.  *Id.*  The court

noted that "this practice is not unusual in today's business climate" because small firms must often pool

resources to reduce business costs that would otherwise cripple the smaller firm.  *Id.* The fact that

related entities pool such resources, the court reasoned, should not subject "tiny firms" to liability under

12

federal employment laws.  *Id.*

Defendants' reliance on *Hukill* is misplaced for several reasons.  First, the procedural posture of the cases are markedly different.  In *Hukill,* a trial had been conducted, and a verdict was entered.  *Hukill*, 192 F.3d at 443.  In contrast, here the Court has permitted only minimal discovery, limited to the precise jurisdictional issues addressed in the mandatory four-part test prescribed in Section 2000e-1(c).[6]  As such, to survive the instant Motion to Dismiss, the Plaintiff need only adduce evidence sufficient to create a genuine issue of material fact as to the *jurisdictional* factors enumerated in Section 2000e-1(c), whereas the *Hukill* court reviewed evidence relevant both to jurisdiction and to the liability of the defendant-entity.  *See Hukill*, 192 F.3d 437.

Second, the cases are factually distinguishable.[7]  Most fundamentally, based on the record before this Court, there is no indication that CSA and Combat Support Associates operated independently in the way that the individually-managed service stations did in *Hukill.*  To the contrary, the limited record now before the Court suggests that the two companies' operations were so

---

[6]*Hukill* suggests that the overwhelming thrust of the four-part test should be whether the related entity played any role in the particular employment decision(s) at issue.  *See Hukill*, 192 F.3d at 442.  However, this formulation collapses two distinct inquiries: the jurisdictional inquiry, on the one hand, and the liability determination, on the other.  *See* 3 Lex K. Larson, *Labor and Employment Law* § 53.09[1][a] (2005).  As to the jurisdiction question, at least in the context of Section 2000e-1(c), the four-part test is designed to be a generalized inquiry into the corporate relations upon which courts can determine whether subject matter jurisdiction exists over a particular defendant. *Cf. id.*  In contrast, the determination of the defendant-entity's *liability,* is properly focused on the more fact-intensive question of the entity's role, if any, in the employment actions giving rise to the lawsuit.  *Id.*

[7]The cases are also distinguished by the evidence in this case that labor relations were centralized between CSA and Combat Support Associates.  *See* discussion *infra* Section C.  There was no such evidence in *Hukill,* 192 F.3d at 442.

intertwined as to be virtually indistinguishable.

Finally, the public policy concern underlying the holding in *Hukill* is not applicable here.  The *Hukill* court reluctantly applied the four-part test in the FMLA context because the test was prescribed in applicable United States Department of Labor regulations.  *Id.* at 442 (noting that the four-factor test was not mandatory because Congress had not directly addressed the issue).  Evident from the opinion is the court's concern over extending the reach of FMLA to "tiny firms" which were specifically exempted from that law by Congress.  *Cf.  id.* at 443-444 (quoting *Papa v. Katy Indus., Inc.,* 166 F.3d 937, 942 (7th Cir. 1999)).  As previously discussed, however, the four-part test applied here specifically fashioned by Congress to protect United States employees employed by foreign entities.

In light of the applicable law and the evidentiary submissions, Plaintiff has satisfied his burden in establishing that the operations Combat Support Associates and CSA were interrelated.

###    B.     __Common Management__

Likewise, the evidence before the Court suggests that CSA and Combat Support Associates shared management.  At least eight directors of Combat Support Associates also served on the Board of CSA.  (Pl.'s Opp. Ex. 28.)  Two of the three members of the Combat Support Associates Executive Committee have management responsibilities with CSA.  (*Id.*)  In addition, Defendants' own organizational chart describes a management "swapping" relationship between the two entities.  The Project Manager for the Camp Doha Contract is a Combat Support Associates employee, and the Deputy Project Manager is a CSA employee. (Pl.'s Opp. Ex. 3 at DEF 1295.)   Whenever the Project Manager is absent from Kuwait, his responsibilities are to be assumed by the Deputy Project Manger,

14

who is to "tak[e] leave of absence without pay from the position of President, CSA, Ltd." (*Id.* at 1296.) During this period, the position of Deputy Project Manager–and the head of CSA–"is to remain dormant." (*Id.*)

The record also contains evidence suggesting that the companies shared lower level managers. Most significantly, Donald Bedea, who is one of the supervisors who denied Plaintiff's promotion, worked as a "dual status employee" for both CSA and Combat Support Associates even though his official title was Manager of Unit Set Maintenance Department for CSA. (Bedea Decl. ¶ 4.) The same type of "dual status management" was evident even at the lowest levels of management, as evidenced by the fact that Ella King-Spencer was promoted to act as a "CPC Supervisor" for CSA while also working for Combat Support Associates as a dual status employee. (*See* Pl.'s Opp. Ex. 41.)

Taken together, this evidence is more than sufficient to satisfy Plaintiff's burden with respect to the second element of Section 2000e-1(c)(3)**.**

### C.   <u>Centralized Labor Relations</u>

Based on the undisputed evidence now before the Court, it appears that the labor relations between CSA and Combat Support Associates was sufficiently centralized to confer subject matter jurisdiction upon this Court. First, the evidence suggests that CSA and Combat Support Associates shared a human resources department which was responsible for employees in both companies. Defendants submitted an affidavit from Steven Wise, who contends that, during his tenure as human resources manager, he worked only for CSA and was only responsible for employment decisions concerning that department. (Wise Decl.). However, this testimony is contradicted by promotion

forms which he signed on behalf of CSA and Combat Support Associates pertaining to Ella King-Spencer, a "dual status" employee, whose promotion Wise authorized.   (*See* Pl.'s Opp. Ex. 41.) Furthermore, there is conflicting evidence regarding the status of the human resources manager position after Wise left in August of 2002.  From the submissions, it appears that Combat Support Associates' Program Manager William Sterling "rotated in" a human resources professional from AECOM, one of the owners of Combat Support Associates, to act as the human resources manager for both companies. (Pl.'s Opp. Ex. 39 at DEF 1143.)

Defendants attempt to minimize the significance of this evidence by arguing that, to the extent that the human resources offices were shared, the arrangement was merely the type of "pooling" of resources discussed in *Hukill,* 192 F.3d at 442.  Yet, the record suggests that the human resources staff had significant involvement in personnel matters which are directly relevant to this lawsuit.  (*See* Wise Decl. ¶ 4 (Stating that human resources staff responsible for: "recruiting and hiring of personal; promulgation of Human Resources policies and procedures . . . participation in disciplinary decisions; participation in termination decisions; administration of employee evaluations; participation in employee promotion decisions; and administration of benefits.").)  In contrast to the administrative services purchased in *Hukill,* these types of activities are precisely the type of evidence which support a finding of centralization of labor relations.  *See Hukill,* 192 F.3d at 442 (holding that factors not met where common owner had no involvement in personnel matters).

Furthermore, there is undisputed evidence that Combat Support Associates had substantial input into CSA's employment policies and procedures.  According to CSA employment policies, "[t]he

Combat Support Associates Project Manager has full discretion to make exceptions to any of [CSA's disciplinary procedures] especially where good business practice demands immediate suspension or dismissal of an employee." (Pl.'s Opp. Ex. 21 at DEF 0833.) Further, "[i]f a disciplinary action involves suspension or termination of an employee, the Combat Support Associates Project Manager must have final concurrence." (*Id.*) While not disputing this extraordinary oversight, Defendants argue that this Court should discount the significance of the powers provided to Combat Support Associates because the company never exercised this power. This contention is undermined by the evidence. In August of 2000, Thomas Wakefield, then the project manager for Combat Support Associates, issued a reprimand of CSA employee Rashad Jihad for speeding. (Pl.'s Opp. Ex. 40.) This suggests that Wakefield did play a role in the day-to-day discipline of CSA employees.

Additionally, the record suggests that Combat Support Associates dictated other specific employment policies to be applied to CSA employees. Fundamentally, Combat Support Associates was directly responsible for establishing and approving CSA's compensation and benefit plans. (Pl.'s Opp. Ex. 43.) Similarly, Combat Support Associates prescribed the policy to be applied to employees of both companies regarding outside training opportunities. (Pl.'s Opp. Ex. 15.)

Based upon this evidence, Plaintiff has satisfied his burden in establishing that the CSA and Combat Support Associates were sufficiently centralized to confer subject matter jurisdiction upon this Court.

### D.   <u>Common Ownership or Financial Control</u>

Finally, there is no dispute that Combat Support Associates owns and controls CSA. (Def.'s

Reply at 13.)  Nevertheless, Defendants submit that CSA's ownership is of limited probative value because ownership and financial control is merely reflective of a parent/subsidiary relationship.  *See Walker v. Toolpushers Supply Co.,* 955 F. Supp. 1377, 1384 (D. Wyo.1997) (recognizing that, "in view of the strong policy against disregarding corporate forms in imposing liability, there must be much more than common ownership of entities to establish liability) (cited in Def.'s Reply at 12).   In this case, however, CSA's ownership provides critical insight into the question of the corporate relationship between CSA and Combat Support Associates.  CSA was founded by Combat Support Associates, which is itself a joint venture comprised of three American companies, and created for tax structuring purposes in connection with the Camp Doha Contract with the United States Army.  (*Cf.* Def.'s Reply at 12 n.5; Barlow Decl. ¶6.)  The security clearance requirements of the United States Army clearly mandate that only United States citizens may be granted the security clearance necessary to perform classified work.  (Pl.'s Opp. Ex. 14.)  The somewhat perplexing relationship between CSA and Combat Support Associates was born out of the necessity of complying with the United States Army's regulations while addressing United States tax liability issues.  Thus, the issue of CSA's ownership and financial control provides an essential context for determining precisely which entity is Plaintiff's employer for the purposes of this lawsuit.

To summarize, Plaintiff has satisfied his burden as to each of the four elements of the jurisdictional inquiry mandated by Section 2000e-1(c).  Therefore, Defendants' Motion to Dismiss for lack of subject matter jurisdiction will be denied.

**IV.** **Conclusion**

For the foregoing reasons, Defendants' Motion to Dismiss will be DENIED.  A separate Order

follows.

Dated:   <u>May 23, 2005</u>                    <u>/s/                                        </u>
                                          Richard D. Bennett
                                          United States District Judge